T.C. Memo. 1997-420


UNITED STATES TAX COURT


GENERAL DYNAMICS CORPORATION AND SUBSIDIARIES, Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent

GENERAL DYNAMICS FOREIGN SALES CORP., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 19202-94, 19203-94.   Filed September 22, 1997.


David C. Bohan, Richard T. Franch, James M. Lynch, Philip A. Stoffregen, Francis J. Wirtz, David D. Baier, Lawrence S. Schaner, Gregory S. Gallopoulos, and Debbie L. Berman, for petitioners.

William H. Quealy, Jr., Alice M. Harbutte, Jeffrey A. Hatfield, Thomas C. Pliske, and William T. Derick, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  General Dynamics Corp. and its consolidated subsidiaries (GENDYN) (docket No. 19202-94) and its foreign sales corporation, General Dynamics Foreign Sales Corp. (GENDYN/FOREIGN) (docket No. 19203-94), are the petitioners in these consolidated cases.  Respondent determined corporate income tax deficiencies for GENDYN in the amounts of $26,118,976 and $291,218,973 for its 1985 and 1986 taxable years, respectively. With respect to GENDYN/FOREIGN, respondent determined a $586,533 corporate income tax deficiency for its 1986 taxable year.  These cases are consolidated and related for purposes of briefing and opinion, and the issues have been divided into two generalized categories:  domestic and foreign.  This opinion addresses the domestic issues involving GENDYN.[1]

The issues for our consideration here pertain to GENDYN's accounting methods for Federal income tax purposes.  With respect to Government contract numbered F33657-82-C-2034 (Contract 2034 or 2034), the parties agree that GENDYN was entitled to use the completed contract method.[2]  GENDYN reported the income and related deductions based on the premise that its Government

---

[1]  See General Dynamics Corp. & Subs. v. Commissioner, 108 T.C. 107 (1997), for foreign issues.

[2]  For purposes of this case, references to the Government are to the Federal Government as a party that contracted with petitioners.  We do not use the term "Government" to refer to respondent.

contract was a 48-month contract (multiyear) for delivery of 480 aircraft.  Respondent determined that 2034 should be treated as four separate agreements, each for the delivery of 120 aircraft.

With respect to Government contract numbered F33657-82-C-2038 (Contract 2038 or 2038), GENDYN allocated the income and expenses to multiyear Contract 2034 so that Contract 2038 was reported under the completed contract method for Federal income tax purposes.  Respondent determined that the income and expenses from 2038 were not part of the completed contract reporting for Contract 2034.  Consequently, respondent also determined that Contract 2038 should have been separately accounted for under the accrual method of accounting.

## FINDINGS OF FACT[3]

GENDYN was incorporated on February 21, 1952, and, at all relevant times, was the common parent of a group of corporations that filed consolidated corporate Federal income tax returns.  At the time the petitions were filed in these cases, GENDYN's and GENDYN/FOREIGN's principal places of business were in Falls Church, Virginia.  GENDYN engineered, developed, and manufactured various products for the U.S. Government and, to a lesser extent, foreign Governments, including military aircraft, missiles, gun systems, space systems, tanks, submarines, and electronics, and

---

[3]  The parties' stipulation of facts and exhibits are incorporated by this reference.

produced and/or provided other miscellaneous goods and services. GENDYN was also involved in other business activities, including the design, engineering, and manufacture of commercial aircraft; the mining of coal, lime, limestone, sand, and gravel; the manufacture and sale of ready-mix concrete, concrete pipe, and other building products; production of commercial aircraft subassemblies; the design, engineering, and manufacture of commercial space launch vehicles; and shipbuilding.

GENDYN, for the taxable years 1977 through 1986 (concerning the contracts under consideration), used the completed contract method (CCM) for reporting Federal income tax and the percentage of completion method for its financial accounting purposes. In 1976, GENDYN applied to respondent for permission to change its accounting method to the completed contract method for reporting income from its long-term contracts for all of its divisions. GENDYN advised respondent that CCM would not be used for financial reporting purposes. In 1977, respondent approved GENDYN's use of CCM for all its long-term contracts.

During 1980, an Internal Revenue Service examining agent challenged GENDYN's use of CCM. The agent submitted a request for a technical advice memorandum to respondent's National Office. The agent argued, inter alia, that GENDYN's use of CCM resulted in the unreasonable deferral of income. In a technical advice memorandum released in 1983, the National Office rejected

the agent's arguments and affirmed GENDYN's permission to use CCM.

GENDYN manufactured the F-16, a tactical military aircraft. Originally designed as a "dog fighter", the F-16 evolved into a multirole aircraft, capable of performing air-to-air combat, air defense, and air-to-ground missions in all types of conditions.

In January 1972, the Air Force issued a Request for Proposal (RFP) for the development of a prototype aircraft designated the "Light Weight Fighter". In April 1972, the Air Force selected two aerospace companies, Northrop Corp. and GENDYN, to develop competing prototypes. Following a "fly off" of the two prototypes, on January 13, 1975, the Air Force awarded GENDYN contract numbered F33657-75-C-0310 (0310 contract) for the full-scale development of what ultimately became the F-16.

The 0310 contract required GENDYN to complete development of the F-16 and to build several developmental aircraft, which differed considerably from the prototype. The 0310 contract also granted the Air Force options to procure production F-16's (as opposed to the developmental versions) for the program years 1977, 1978, and 1979, as well as a separate option to purchase 348 F-16's for foreign Governments. The first developmental aircraft flew in December 1976, and the first production version flew and was delivered during 1978. From the time the Air Force selected GENDYN through 1981, the Air Force purchased more than 650 F-16's.

At the time that the F-16 was being developed, the Air Force was also developing a significant variety of new weapons and avionics systems, including missiles, infrared navigation and targeting equipment, and advanced countermeasures. During 1978 and 1979, GENDYN and the Air Force jointly developed a plan for the systematic, phased integration of new technologies into the F-16. This plan was known as the Multinational Staged Improvement Program or "MSIP". MSIP was designed to be implemented in three stages. The first phase involved the redesign of the aircraft's structure, wiring, and cooling systems to accommodate new navigation, targeting, and other systems. In the second phase, GENDYN would introduce entirely new computers, environmental control systems, pilot-vehicle interface systems, and avionics systems, and would make other changes in anticipation of various new weapons and sensors which were then under development. In the final phase, GENDYN would introduce the remaining new systems, as they became available.

MSIP was originally authorized under the first F-16 contract, the 0310 contract, and, after April 15, 1982, it was continued under Contract 2038. MSIP was made part of a separate contract, primarily to delineate it from the production contracts (i.e., Contract 2034) and developmental work.

While the Air Force and GENDYN were planning the technological evolution of the F-16, they were also exploring ways to lower the future unit costs of the aircraft so as to make

the enhanced versions more affordable.  One approach explored by the Air Force and GENDYN was to use multiyear contracts (a contract covering more than 1 year) rather than a series of single-year contracts.  From GENDYN's point of view, single-year contracts provided little incentive to invest in capital equipment or otherwise attempt to reduce its costs.  Additionally, they did not allow GENDYN to take advantage of quantity discounts in ordering materials from subcontractors and related suppliers.  Finally, GENDYN found the single-year contract approach to be more expensive to negotiate and administer, and it resulted in higher overhead costs per aircraft.

The Air Force, however, could not make a contractual commitment that transcended the Government's fiscal year because of the Antideficiency Act, 31 U.S.C. sec. 1341 (1994) (formerly 31 U.S.C. sec. 665).  The Antideficiency Act prohibits the executive branch from obligating funds not yet appropriated by Congress.  Multiyear contracting is an exception to the full-funding rule.

A multiyear contract enabled the Government to provide for up to 5 years of requirements without authorized full funding at the awarding of a contract.  With a multiyear contract, the first year's requirement is usually funded in full, but the ensuing years' are not.  A multiyear contract commits the Government to purchase the quantity of items specified in the contract.  The

contractor commences work on the entire quantity, not just the (lesser) quantity that has been fully funded. So, for example, the contractor may commit to purchase sufficient quantities of parts from subcontractors to construct all of the contracted items, even though the parts may not be utilized until several years later.

The Government may cancel or terminate a multiyear contract if funds are not appropriated by Congress or the contracting department or agency no longer requires the item being procured. If a multiyear contract is canceled, the contractor may attempt to recover certain of its incurred costs, plus a reasonable profit, not to exceed a specified "cancellation ceiling". The provisions governing cancellation are unique to multiyear contracts; no other form of Government contract may be canceled. The Government may cancel a portion of a multiyear contract only on the first day of each successive fiscal year encompassed within the contract. Any cancellation applies to all remaining years in the canceled contract.

In the second half of 1980, the Air Force assembled a task force to study the potential benefits of multiyear contracting for the F-16. Based upon its analysis, it was estimated that the Air Force could save approximately 10 percent per aircraft by procuring the F-16 through one or more multiyear contracts as opposed to using the annual contracting approach.

The Air Force asked GENDYN to analyze the savings potential by using multiyear contracts. GENDYN surveyed its subcontractors and suppliers to determine whether (and by how much) it could negotiate lower prices for larger buys and higher production rates. GENDYN also evaluated potential savings in the areas of labor and overhead.

GENDYN and the Air Force anticipated that multiyear contracting would enable GENDYN to lower its material cost and result in labor cost savings. Overhead cost savings were expected, and GENDYN and the Air Force anticipated other benefits from a multiyear procurement of F-16's. Both GENDYN and the Air Force had significant business purposes for entering into a multiyear contract instead of the single-year contracts to which they were then committed.

Under the military regulations governing multiyear contracts, sole source contracts may be awarded if a Government department can demonstrate certain benefits and conditions. In order to meet the regulations, the Air Force, on January 22, 1981, issued a notice inviting GENDYN to submit comparative alternate proposals for the production of 480 F-16 aircraft applying either to a series of annual-buy contracts or a multiyear contract.

GENDYN responded to the RFP on March 17, 1981. In its comparative price proposals, GENDYN priced the aircraft using a variety of assumptions. As requested in the RFP, GENDYN

submitted a firm price for all 480 aircraft to be delivered at the rate of 8 per month assuming, on the one hand, a single multiyear contract spanning 5 program years and, on the other hand, a series of 5 annual buys. GENDYN also submitted comparative price proposals for a multiyear contract and a series of 4 annual procurements assuming a delivery rate of 10 per month. GENDYN's comparative price proposals demonstrated that the price for the aircraft would be significantly lower if purchased under a multiyear contract rather than under a series of annual buys. Savings would inure whether the delivery rate was assumed to be 8 or 10 aircraft per month. Assuming a delivery rate of 10 per month, GENDYN estimated cost savings to the Air Force of approximately $325 million, or 11.2 percent of the total contract price.

From its point of view, GENDYN was unwilling to commit to a single 1982 program-year contract and fixed-price options for program years 1983-1985 because that would have exposed GENDYN to all of the risks of cost overruns in prior program years while allowing GENDYN none of the potential rewards of cost underruns. GENDYN believed that if costs were overrun, the Air Force would exercise the options at the predetermined price and thus avoid having to share in the overrun; and that if the costs were underrun, the Air Force would decline to exercise the options and simply negotiate new, lower prices for subsequent program years.

In this regard the Air Force generally would determine whether lower prices could be negotiated.

The Air Force, by reviewing GENDYN's Fort Worth operation, confirmed that there would be savings in a multiyear approach. Based in part on the information it received in response to the RFP, the Air Force submitted a justification package to Congress in October of 1981, as required under the multiyear legislation. Late in 1981, the Air Force decided it wished to purchase the aircraft through a multiyear procurement. At that time, however, Congress had not yet authorized the Air Force to proceed in that manner. In addition, Congress had not amended the multiyear legislation to increase the maximum allowable cancellation ceiling to an amount above $5 million, a change that was necessary to permit multiyear contracting for large contracts.

While awaiting congressional action to increase the maximum allowable cancellation ceiling, on December 3, 1981, GENDYN and the Air Force entered into the 480-aircraft agreement (Contract 2034). Contract 2034 concerned the production of 480 F-16 aircraft, 120 in each of the 4 program years 1982-1985. Contract 2034 was subjected to numerous modifications. Although it provided for 480 aircraft to be delivered at a rate of 120 per program year, GENDYN was authorized to perform work leading to the delivery of all 480 aircraft.

Initially, money for the first year's production (1982) was appropriated, along with funding for long-lead items and

"Economic Order Quantity" (EOQ) for all 4 fiscal years, including the 1983, 1984, and 1985 program years.  Long-lead items consist of parts or components required to protect future delivery schedules, even beyond the year of procurement.  EOQ items are parts and components that a contractor may procure in sufficient volume to obtain quantity discounts.  EOQ is a concept that is unique to multiyear contracting.

In certain types of Government contracting, after a contract has been awarded and work commenced, prices may be ultimately negotiated by a process known as "definitization".  Definitization of the Air Force's price for the F-16's was to be accomplished with respect to all 480 aircraft.  Contract 2034 identified the items required to be delivered by use of Contract Line Item Numbers, or "CLIN's".  CLIN's, in the broadest of terms, describe the part or item under contract.  For example, CLIN 0002AC contains the following:  "45 EACH - USAF FY83 F-16C AIRCRAFT".  Other CLIN's in Contract 2034 required GENDYN, among other requirements, to:  Incorporate engineering changes in the aircraft, furnish training equipment and incorporate engineering changes in such equipment, provide support equipment and incorporate engineering changes in such equipment, furnish retrofit kits and alternate mission equipment, generate a variety of test and other data, and provide repair services for certain Government-furnished equipment.

Contract 2034, in CLIN 0001, also provides that the deliverables identified in the other CLIN's "are neither priced nor funded nor is the Government under any obligation to subsequently acquire said items."  Contract 2034, in addition to the CLIN's, contains about 200 pages of clauses that define the terms and conditions under which GENDYN would manufacture and deliver the 480 aircraft.  Included in the subject matter of these clauses, among other items, are requirements and terms for EOQ contracts, change proposals, rights in data, definitization, etc.

In essence, therefore, Contract 2034 was a basic multiyear agreement between the Air Force and GENDYN, under which GENDYN was expressly authorized to begin work on the delivery of 480 aircraft, including the ability for EOQ and long-lead items.  In response to the agreements reached with the Air Force, GENDYN's Fort Worth Division began planning for the production of all 480 aircraft, including the exercise of options obtained from vendors to convert their annual subcontracts into multiyear subcontracts.

On December 29, 1981, Congress passed the fiscal year 1982 Department of Defense Authorization Act, 10 U.S.C. sec. 2301 (Supp. V 1981), which increased the cancellation ceiling applicable to multiyear contracts from $5 million to $100 million and expressly authorized the Air Force's multiyear procurement of F-16's.  This legislation significantly expanded the use of

multiyear contracting for the procurement of large, complex

weapons systems.

GENDYN and the Air Force moved quickly to modify Contract

2034 to accommodate the multiyear procedure, which, in

particular, would encompass the increased cancellation ceiling.

This modification was embodied in Modification P00002 (POO 2),

which was executed on January 26, 1982.  POO 2 provided:

> The USAF FY83 thru FY85 Economic Order Quantity
> effort from 6 Nov 81 through 31 Jan 82 is hereby
> amended to become the USAF FY82 thru FY85 program on a
> multiyear basis thru 31 Oct 82.  This modification
> P00002 supersedes the USAF FY82 long lead effort
> authorized on contract FY33657-78-C-0669 in its
> entirety.  * * *

In addition to memorializing Congress' approval of the

multiyear procurement of F-16's, POO 2 also transferred to

Contract 2034 $292 million that had been obligated for the long-

lead effort on the 120 aircraft identified for the 1982 program

year and obligated an additional $188.5 million for long-lead and

EOQ items for all 4 program years.   These amounts, however, were

insufficient to fully fund the production of 480 aircraft but

were intended for EOQ and long-lead items.

POO 2 also contained the following language:

> The Contractor is authorized, consistent with
> Special Provision H-77 entitled "Material Commitment",
> to incur labor, material and other associated and
> allowable costs for any Program Year hereunder.

POO 2 also added a "Cancellation of Items" provision, unique

to multiyear contracts, which defines the rights and obligations

of the Air Force and GENDYN in the event the Air Force cancels its requirement for the items covered by the contract. Clause I-6 of Contract 2034 permitted the Air Force to cancel for any program year that had not yet been fully funded, in the event Congress did not appropriate the necessary funds.

In the event that the Air Force canceled the contract, GENDYN was entitled to recover costs incurred on items concerning aircraft that were not yet fully funded. GENDYN was also entitled to recover specified amounts on the aircraft that were fully funded and would be ultimately completed and delivered to the Air Force after the contract cancellation.

In particular, GENDYN's cancellation claim could include:

(i) reasonable preproduction and other non-recurring costs, incurred by the Prime Contractor or his subcontractors applicable to and which normally would be amortized in all items to be furnished under the multiyear requirements (such as plant rearrangement, special tooling, preproduction engineering, initial rework, initial spoilage, and pilot runs);

(ii) labor, materials and other costs incurred by the Contractor or its subcontractors for production of the cancelled items consistent with Special Provision H-77 entitled "Material Commitment";

(iii) the reversionary cost impact on the non-cancelled items; and

(iv) a reasonable profit on such incurred costs.

"Reversionary cost impact" would involve cost variations (presumably increased cost to GENDYN because of losing the benefit of volume discounts and labor savings). In the event of

cancellation, not all of the costs identified in clause I-6(f) would necessarily be recoverable. Only those costs that were allowable could be recovered, and only in an amount that did not exceed the negotiated cancellation ceiling. The cancellation ceiling agreed to in Contract 2034 was less than the amount GENDYN had originally estimated and proposed would be necessary to make itself financially whole in the event the program was canceled.

In addition to its right to cancel Contract 2034 for lack of funding or because it no longer needed the aircraft, the Air Force possessed the right (which is standard and required in all Government contracts) to terminate the contract for convenience or for default. In a termination for convenience, the Government orders a contractor to stop work for any or no reason at any time prior to the delivery of the last item required under the contract. The contractor then submits a claim to recover its incurred costs plus a reasonable profit. Not all of the contractor's costs may be recoverable.

In a termination for default, the Government orders the contractor to halt work because the contractor has not complied with all of the material terms and conditions of the contract. The Government may then have a claim against the contractor to recover unliquidated advances and other contract damages.

As of the execution of POO 2, Contract 2034 remained "undefinitized", that is, unpriced. It was not until March 11,

1983, that an agreement on price was reached and July 31, 1983, that the agreement was formalized in an amendment to Contract 2034.

In late 1981 GENDYN became aware that 300 of the 480 F-16 aircraft to be produced under Contract 2034 were to be technologically advanced models. Accordingly, GENDYN submitted revised cost estimates consistent with the technological upgrades. After a revision of the initial submission, the Air Force accepted GENDYN's proposal for negotiation.

The Air Force conducted extensive "fact-finding" with respect to the assumptions underlying GENDYN's proposals. For example, the Air Force reviewed purchase orders accounting for at least 90 percent of GENDYN's material and subcontract costs to confirm their prices, terms, and conditions. It also reviewed the learning curves on which GENDYN's labor hour estimates were based to ensure that GENDYN was performing and could continue to perform at the levels indicated in the proposal.

Because Contract 2034, was to be a fixed-price incentive, firm-target contract, the Air Force and GENDYN did not negotiate the contract price itself but instead negotiated the formula by which the final price would be determined upon completion of the contract. Specifically, the Air Force and GENDYN agreed upon the target cost, target profit, target price, ceiling price, and sharing ratio to be included in the contract. Target cost is the negotiated estimated cost at completion. Target price is the

target cost plus target profit.  The ceiling price is the maximum amount the Government is required to pay under a contract, regardless of the contractor's costs.  The sharing ratio is the negotiated percentage by which the Government and the contractor split target cost overruns or underruns.

In negotiating the profit rate to be applied to Contract 2034, the weighted guideline method was used.  This was a method used prior to multiyear contracts, and GENDYN and the Air Force recognized that the maximum weighting permitted should be used to account for risks they believed would be inherent in multiyear contracting, which at that time was a unique approach for Federal Government contracting.

Using the maximum weighting allowed by Department of Defense regulations to arrive at the target profit, GENDYN and the Air Force agreed to the following contract values:  Target cost, target profit, and target price of $2,328,864,419, $315,902,006, and $2,644,766,425, respectively.  The agreed ceiling price was $2,863,110,458.  The sharing ratio was to be GENDYN 40 percent and Air Force 60 percent, respectively.

The actual price that GENDYN would receive under Contract 2034 would, ultimately, be determined at the time the contract was completed.  It would be based upon a comparison of GENDYN's actual cost with the negotiated target cost.  If actual cost was lower than the target cost, then GENDYN would receive its total final cost plus the target profit plus 40 percent of the

difference between actual cost and target cost.  If the actual cost was higher than the target cost, GENDYN would receive its total final costs and target profit less 40 percent of the difference between actual and target cost.  Under no circumstances would GENDYN receive an amount greater than the ceiling price, regardless of its actual cost.

The negotiated target cost, ceiling price, and sharing ratio implicitly defined an amount above which GENDYN bore 100 percent of all additional cost.  Above this point, called the point of total cost assumption, GENDYN's profit declined dollar-for-dollar with every dollar of additional cost.  The negotiated contract values and the formula by which the final contract price would be determined were set out in the Incentive Price Revision clause, which was added to Contract 2034 by Modification P00080 (POO 80), dated July 31, 1983.  Consequently, a single target cost, target price, ceiling price, and sharing ratio were established for the entire quantity of 480 aircraft.

The final price for the aircraft delivered pursuant to Contract 2034 was to be determined upon the delivery of the last aircraft, based upon a comparison of GENDYN's total costs with the contract's target cost.  Contract 2034 did not prescribe a mechanism by which price and profit could be separately computed for any program year.  As of the beginning of 1993, a final price determination had not been made for Contract 2034 and related modifications.

Such modifications to Contract 2034 contained separate prices for each of the CLIN's that identified for billing purposes the quantities and models of F-16 aircraft required for each program year. CLIN prices were adjusted by program year from time to time based upon comparisons of GENDYN's actual costs with the contract's target cost. These billing price adjustments were sometimes retroactive; that is, they changed the billing price of aircraft already delivered.

Although the Air Force and GENDYN had negotiated a single pricing arrangement covering all 480 aircraft, it was necessary for the proposed costs to be individually broken out by program year for traceability and funding reasons. It was also necessary to evaluate and negotiate amounts for each fiscal year in the same manner.

The F-16 aircraft procured under Contract 2034 were manufactured by GENDYN's Fort Worth Division in a Government-owned, contractor-operated manufacturing facility in Fort Worth, Texas. At the height of production, approximately 12,000 GENDYN employees worked on the F-16 program, including more than 1,000 engineers. GENDYN manufactured a total of 534 aircraft under Contract 2034 and subsequent modifications, the 480 plus 54 aircraft acquired by the Government through the exercise of the options that were added to Contract 2034 by POO 80. The aircraft were continuously produced and delivered without any inter-program year interruptions. Some F-16's were

delivered prior to, or simultaneously with, F-16's identified for earlier program years. There was no fixed model or type of F-16, and GENDYN did not maintain an inventory of unsold aircraft. The F-16 aircraft were to be constructed on an ongoing basis pursuant to the specifications required by the contract and set by the Air Force.

The manufacture of F-16's under multiyear contracting was a complex process. From the procurement of long-lead items through final assembly and testing, it took GENDYN 2-1/2 to 3 years to build the first aircraft. Fabrication and assembly took approximately 13 months. At least 1 year before the first aircraft could be built, GENDYN had to establish the production configuration from which it would develop the drawings and bills of materials. The plant then had to develop and test the production tools and otherwise complete production planning. GENDYN would then issue purchase orders for the major subsystems and components, including radars, computers, screens, and sensors. GENDYN would then purchase the raw materials (e.g., aluminum) necessary to fabricate the different parts of the aircraft.

The aircraft were fabricated using a modular approach on a production line nearly 1 mile long. Pieces of the airframe, including the forward fuselage, inlet, center fuselage, aft fuselage, stabilizing tail assembly, and wings, were designed and fabricated separately and then joined together on the line. Some

of the key subsystems incorporated in the F-16 were developed and produced by GENDYN itself. Other subsystems were procured from vendors and subcontractors. Approximately 115 components were provided by the Air Force as Government-furnished equipment.

GENDYN was generally responsible for integrating all of the various subsystems into the F-16 while guaranteeing that the aircraft performed according to specification. GENDYN could procure equipment for the F-16 only from suppliers that had been "qualified" by the Air Force. The process by which a supplier becomes "qualified" is difficult and time-consuming, usually lasting about 3 years. Under Contract 2034, GENDYN bore the risk that a subcontractor would go out of business or default on its subcontract. If a single-source subcontractor defaulted due to technological difficulties or otherwise, GENDYN would be required to absorb the time and expense of qualifying an alternative source of supply without any relief from the price and schedule provisions of Contract 2034.

To meet its delivery schedule with the Air Force, GENDYN had to coordinate the production and delivery schedules of all of its suppliers and subcontractors. Due to the extensive coproduction of various components, the F-16 program under Multiyear I became the most complicated aircraft assembly and production program ever undertaken. Notwithstanding that GENDYN had manufactured F-16's before, numerous problems arose during the performance of the multiyear contract, many of which were entirely unforeseen.

In late October 1983, just 6 months after GENDYN began delivering aircraft under the multiyear contract (2034), cracks began appearing in a critical structural element of the airframe known as the 446 bulkhead (so designated because it is located 446 inches from the nose of the aircraft). The 446 bulkhead is a large aluminum ring that encircles the aircraft's engine and supports the engine's weight, thrust, and torque. The 446 bulkhead also bears some of the loads created by the tail wing and the fuel tanks, and the cracks could expand with catastrophic consequences.

When the cracks appeared, the Air Force began to inspect the aircraft following every 25 hours of flight time to ensure the cracks had not reached a critical length. The Air Force issued a notice of deficiency to GENDYN and began withholding progress payments. After extensive engineering analysis, GENDYN developed a new design for the 446 bulkhead which GENDYN believed would prevent the cracking. Developing this solution took more than 1 year, much longer than GENDYN expected.

Minor problems in performance were common, and most aircraft delivered to the Air Force under Contract 2034 were accepted with deviations from and waivers of various aspects of the aircraft's specification. Depending upon the nature and seriousness of the deviation, the Air Force might accept or refuse a nonconforming aircraft. In some cases, the Air Force would accept the aircraft but withhold some portion of the consideration due GENDYN until

the deviation was cured.  In other cases, the Air Force would accept the aircraft "as is" but require an adjustment of the price.

Throughout the performance of Contract 2034, the F-16 underwent significant technological evolution.  Aircraft manufactured later in time included the incorporation of systems and features that were not available on earlier aircraft.  To distinguish aircraft with different capabilities and configurations, GENDYN designated each F-16 as belonging to a particular "block".  The first production F-16's belonged to Block 1.  The higher the block number, the newer and more sophisticated the aircraft.  Design changes within a block of F-16's sometimes resulted in the designation of "miniblocks". Even within miniblocks, however, few F-16's, perhaps only two or three, were virtually identical.

The aircraft sold to the Air Force under Contract 2034 belonged to Blocks 15, 25, and 30.  In Block 15, GENDYN redesigned certain components of the F-16 to accept the advanced electronics and avionics systems that were then being developed under MSIP.  The changes that were introduced in Block 15 were so significant that aircraft manufactured as part of the immediately preceding Block 10 could not be upgraded to the Block 15 capability.  One of the major changes in Block 15 was a redesign of the F-16's wiring and cooling systems to support a new, more advanced radar system that was still under development.

Another change in the Block 15 aircraft was the introduction of inlet hard points which are used to hang weapons and sensors. The inlet hard points were necessary for a low-altitude, nighttime, infrared navigation and targeting system that was under development. Additionally, the size of the horizontal tail was increased by 25 percent on Block 15 aircraft. The larger tail not only changed the aircraft's aerodynamics, it also required the addition of a counterweight to the front of the aircraft.

The transition from Block 15 to the next production block, Block 25, was substantial. The Block 25 aircraft carried advanced computers, sensors, and interface systems. These systems were developed under Contract 2038. Among the systems introduced and implemented in Block 25 were: The AN/APG-68 fire control radar, which could detect low-flying targets, provide high-resolution ground maps, track moving airborne and ground vehicles, and provide ranging data for more accurate weapons delivery; multifunction display set, which included two video monitors displaying a wide array of information that previously had been supplied on separate displays; data transfer equipment used by pilots to load navigation, target, threat, and mission data into the aircraft's onboard computer; communication/ navigation/identification system, which essentially encompassed a control panel and data entry display, a data entry electronics unit, and backup and auxiliary panels, replacing individual

control panels; combined altitude radar altimeter system for improved weapons delivery and low-altitude terrain avoidance; enhanced fire control computer that managed fire control and other functions; and advanced stores management subsystem that performed the inventory, logic and control, status monitoring, and release and jettison functions for the F-16's external weapon stores.

The costs of developing the new systems were charged to the MSIP (Contract 2038) and not to Contract 2034.  Contract 2034's profitability was affected by the success of GENDYN's development efforts under MSIP (Contract 2038) because Contract 2034 did not permit GENDYN relief from delay or change in price in the event GENDYN encountered technological problems under MSIP.  GENDYN encountered numerous technological challenges in developing and building the Block 25 aircraft.

Contract 2034 required GENDYN to have new software ready in time for it to be tested and installed on the first of the Block 25 aircraft.  GENDYN failed to complete the software on time, and in August 1983, the Air Force withheld progress payments on Contract 2038 from GENDYN.  By the time the software was finally completed (in December 1985), GENDYN had to retrofit the software into completed F-16's, at GENDYN's expense.

The Air Force delegated the day-to-day responsibilities for administering Contract 2034 to an Administrative Contracting Officer (ACO) who was stationed at the plant in Fort Worth,

Texas. The ACO was the Air Force representative primarily responsible for enforcing the terms and conditions of the multiyear contract. The ACO administered Contract 2034 as a single contract for the manufacture and delivery of aircraft over a period of years.

The ACO approved, rejected, or deferred GENDYN's requests for progress payments for work performed. Progress payments to a contractor are advances against the contract price based upon the contractor's incurred costs. Progress payments are essentially loans that remain repayable to the Government unless and until they are "liquidated" in exchange for the Government's acceptance of a portion of the contractor's performance under the contract.

GENDYN submitted requests for progress payments on a monthly basis, using an official Air Force form. In accord with the requirements of the form, GENDYN reported all of its costs (not broken down by program year) under the entire contract. The only estimate requested on the form and provided by GENDYN was an estimate of the total cost of completing all 480 aircraft pursuant to Contract 2034.

Based on his determination that GENDYN was underrunning or overrunning the contract, the ACO could also adjust the liquidation rate that applied to progress payments. The Air Force liquidated progress payments using a single liquidation rate, not separate rates by program year.

Contract 2034 required GENDYN to furnish the ACO with certain periodic reports, including a Quarterly Limitation of Payment Report, which contained information regarding GENDYN's performance under the entire contract as well as information pertaining to each program year. Information pertaining to individual program years was requested and used in connection with the available funding. Another report that GENDYN was required to submit on a monthly basis was the Cost Performance Report, or "CPR", which tracked GENDYN's projected cost at completion versus target costs for each program year. To derive program year cost estimates for the CPR's, GENDYN broke down, by program year, its estimate of the total cost. The cost estimate for 1 program year was on the basis that aircraft in the other program years would be manufactured. CPR's were not audited by the Defense Contract Audit Agency. Monthly Contract 2034 profit estimates could become inaccurate due to later occurring events not known at the time of the estimate.

GENDYN also submitted, on a monthly basis, a Contract Cost and Profit Summary or "CCPS". The CCPS was derived from and contained information similar to the CPR. Thus, the CCPS, like the CPR, included breakdowns of GENDYN's estimated costs by program year. GENDYN's program office used the CCPS as one means of assessing how well GENDYN was performing on its contracts. The CCPS was not used, however, for financial reporting purposes. The Air Force used the CPR's as program management tools, not as

accounting reports.  During the performance of Multiyear I, the "Indicated Profit" for each program year, as reflected on the CCPS reports, varied.

Under CCM, GENDYN treated Contract 2034 as a single, long-term contract.  GENDYN reported all of its taxable income for Contract 2034 in its return for 1987, the year in which the last of the 480 F-16's was delivered.

Contract 2038 was negotiated and entered into on April 15, 1982, separate and apart from Contract 2034.  Contracts 2038 and 2034 were not related as to the pricing in each contract. Contract 2038 was a firm fixed-price incentive contract under which petitioner was to provide engineering services in connection with the F-16 aircraft.  Contract 2038 services were set forth in eight CLIN's and each CLIN was further separated into numerous individually priced "sub-CLIN" items to, in part, enable petitioner to receive interim progress payments upon completion of sub-CLIN's.  There were business purposes for treating Contract 2038 separately from Contract 2034 and they were separately funded.  The subject of Contract 2038 was research, design, and development of new systems for the F-16 aircraft.  The new technology was first developed and perfected under Contract 2038 and then integrated into the Contract 2034 aircraft production.  Petitioner claimed the income and deductions in connection with Contract 2038 under CCM.

Respondent determined that Contract 2038 did not qualify for CCM reporting for Federal income tax purposes.

Contract 2038 is not a long term contract that would qualify for CCM reporting of income and deductions for Federal income tax purposes.  The relationship between Contract 2038 and Contract 2034 does not qualify Contract 2038 income and deductions to be reported under CCM.

OPINION

I.  Should Contract 2034 Be Severed Into Four Separate Contracts for Reporting GENDYN's Profit From the Production of Aircraft?

The primary controversy requires us to interpret certain completed contract regulations under section 451[4] and to find facts concerning GENDYN's production of F-16 fighter aircraft.[5] The parties' disagreement arises from respondent's determination that Contract 2034, covering 4 program years, should be severed

---

[4]  Section references, unless otherwise noted, are to the Internal Revenue Code as amended and in effect for the years under consideration.  Rule references are to this Court's Rules of Practice and Procedure.

[5]  The questions raised in this opinion have been largely obviated by the enactment of sec. 460, added by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 804(a), 100 Stat. 2085, 2358, which, with limited exceptions, prohibits the use of the completed contract method for the Federal tax reporting of income and deductions of long-term contracts.  Under sec. 460, most taxpayers, especially those as large as GENDYN, are limited to certain prescribed forms of the percentage of completion method for long-term contracts entered into after Feb. 28, 1986.  The contracts under consideration were entered into prior to the effective date of sec. 460.  We note that GENDYN used the percentage completion method for its financial reporting of long-term contracts for the periods under consideration.

and treated as four separate 1-year contracts. Contract 2034 is a 4-program-year agreement between GENDYN (petitioner) and the Air Force to produce 480 aircraft. The first year was 1982, and aircraft were produced continuously through 1987, when petitioner delivered the 480th aircraft.[6] Petitioner, under CCM, reported the income, expenses, and profit attributable to all 480 aircraft for the 1987 tax year. Respondent, by determining that the contract should be severed into four annually reportable parts of 120 aircraft, caused certain amounts of profit, allocated by respondent, to be moved from 1987 (the year reported) to 1985 and 1986, the tax years before the Court.[7]

Respondent agrees that petitioner is entitled to use CCM for Contract 2034. Respondent also agrees that Contract 2034 is a long-term contract for purposes of applying CCM. Respondent determined that 2034 should be treated as four separate long-term contracts for purposes of applying CCM. In this regard, respondent points out that the central focus of our inquiry should be whether there has been an abuse of respondent's

---

[6] Each program-year's aircraft were being delivered about 2-1/2 years after the contract inception; i.e., 1982 program-year aircraft were delivered about 10 per month during 1984, etc.

[7] Respondent's determination, in addition to accelerating the time when petitioner's profits would be reported, also results in a larger tax liability due to a differential in the maximum corporate tax rate between the reporting year (1987) and the 1985 and 1986 tax years in which some of the profit would be reportable due to any severance. The maximum rate was 34 percent for 1987 and 46 percent for the 1985 and 1986 tax years.

discretion in requiring petitioner to segregate, account for, and report Contract 2034 in four annualized segments.  Petitioner does not dispute that the standard is one of abuse of discretion. On brief, however, respondent couches the issue as follows:

> [W]hether * * * petitioner's regular method of accounting is being <u>improperly</u> applied by petitioner to treat Contract 2034 as a single agreement where the regulation expressly mandates the treatment of Contract 2034 as several agreements so as to prevent the unreasonable deferral of recognition of income.  * * * <u>A method of accounting will only be deemed to result in a clear reflection of income where it approximates the true economic impact of the taxpayer's transactions during the accounting period</u>.  <u>Ford Motor Co. v. Commissioner</u>, 71 F.3d 209, 215-216 (6th Cir. 1995). [Emphasis added.]

Respondent has, to some extent, mischaracterized the focus of this case.  There is no issue concerning whether petitioner <u>improperly</u> applied the completed contract method.[8]  In that same vein, petitioner did not structure Contract 2034 to maximize any deferral inherent in the completed contact method.  The question here is not whether petitioner manipulated the completed contract method or attempted to abuse the methodology by its particular use.  Broadly, the question is whether petitioner has shown there was an abuse of discretion by respondent, measured by the regulatory standards for severance.

---

[8]  This is not a question of whether four separate contracts were improperly aggregated by petitioner.  In the context of this case, we are considering a 4-year contract that respondent determined should be severed into four reportable parts.

Petitioner bears the burden of proof in this case.  Rule 142(a).  The regulations in question, sec. 1.451-3(e), Income Tax Regs., provide the Commissioner with the ability to treat one agreement as several contracts for the purpose of clearly reflecting income.  Respondent's authority in the context of these regulations is to be judged on an abuse of discretion standard.  Sierracin Corp. v. Commissioner, 90 T.C. 341, 368 (1988).  That standard was described in Sierracin as follows:

> Section 446(b) and sections 1.451-3(e), 1.446-1(a)(2), and 1.446-1(b)(1), Income Tax Regs., vest respondent with broad discretion in determining whether a taxpayer's contracts should be severed so as to clearly reflect income. "Since the Commissioner has '[m]uch latitude for discretion,' his interpretation of the statute's clear reflection standard 'should not be interfered with unless clearly unlawful.'"  Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532 (1979), quoting Lucas v. American Code Co., 280 U.S. 445, 449 (1930).  To overcome respondent's determination, petitioner must establish that respondent was plainly arbitrary in severing petitioner's contracts * * *. See Reco Industries, Inc. v. Commissioner, 83 T.C. at 920; Peninsula Steel Products & Equip. Co. v. Commissioner, 78 T.C. at 1046.  * * *  [Id.; fn. ref. omitted.]

To prevail here, petitioner must show that there was no adequate basis in law and/or fact for respondent's determination, i.e., that respondent's exercise of the regulatory discretion was arbitrary or capricious.  Ford Motor Co. v. Commissioner, 102 T.C. 87, 91-92 (1994), affd. 71 F.3d 209 (6th Cir. 1995).

A. Background--Completed Contract Method

The completed contract method of accounting for long-term contracts first appeared in regulations issued under the Revenue

Act of 1918, ch. 18, 40 Stat. 1057.  In general, this method has been described as "peculiarly adapted to a business fulfilling contracts which lap over accounting periods where the ultimate gain or loss cannot be accurately determined until the completion of the contract."  Fort Pitt Bridge Works v. Commissioner, 24 B.T.A. 626, 641 (1931), revd. on other grounds 92 F.2d 825 (3d Cir. 1937); Peninsula Steel Prods. & Equip. v. Commissioner, 78 T.C. 1029, 1047 (1982).  The method "is designed to provide an alternative to the annual-accrual method of accounting for long-term contracts for which the ultimate profit or loss is not ascertainable until the contract is completed."  Spang Indus., Inc. v. United States, 791 F.2d 906, 908 (Fed. Cir. 1986);  RECO Indus., Inc. v. Commissioner, 83 T.C. 912, 921 (1984).  The completed contract method (CCM) differs from the accrual method in that accrued income and deductions are recognized in income when the contract is completed and not necessarily at the end of an annual accounting period.  Fort Pitt Bridge Works v. Commissioner, supra.

Respondent contends that petitioner's reporting of the entire profit in 1987 does not clearly reflect income because "petitioner will be able to unreasonably defer for up to three years, the recognition of substantial amounts of taxable income that was realized upon the completion and delivery of each program year's requirements for aircraft."

The term "clearly reflect income" is not statutorily defined, and generally accepted accounting principles, consistently applied, usually will "clearly reflect income" for tax purposes.  See, e.g., sec. 1.446-1(a)(2), (c)(1)(ii), Income Tax Regs.  The Commissioner, however, may reject a taxpayer's method if it does not clearly reflect income and substitute a method that, in the opinion of the Commissioner, does clearly reflect income.  Thor Power Tool Co. v. Commissioner, 439 U.S. 522 (1979).  It is important to note in this case that respondent is not making the determination that CCM does not clearly reflect income, but that CCM under the circumstances reported by petitioner does not clearly reflect income.

It should be further noted that petitioner's income for each of the severed years would, in any event, not be reported until the last delivery of aircraft for that year, even after considering respondent's severance determination.  Inherent in CCM is delay or deferral of profit or loss beyond that permissible under annual accounting methodology.  That delay is permitted because in the setting of some long-term contracts, a taxpayer is unable to determine whether it has a profit or loss until the contract is completed.  CCM was not provided for by Congress, but instead was sanctioned by regulation.  Ultimately, in years subsequent to those before the Court, CCM was prohibited by Congress (for situations such as those under consideration).

If respondent's severance determination were sustained, petitioner would not be required to report the income for the 1982, 1983, 1984, and 1985 contract years until the year the last aircraft for the program was delivered in the 1984, 1985, 1986, and 1987 tax years, respectively. Petitioner reported Contract 2034 as a single agreement for 480 aircraft. Reported in that manner, the unsevered 1982 profit would be reported after 5 rather than 2 years, and the unsevered 1983 profit would be reported after 4 rather than 2 years and so on until the 1985 year for which the profit would be reported after 2 years (1987), irrespective of whether Contract 2034 had been severed. Although CCM permits reporting of income and expenses beyond the usual annual accounting period, it is respondent's contention that the period of delay here is inherently too long to clearly reflect income. There is no legal basis or factual predicate for such a per se or ipso facto result.[9]

B. The Statute and Regulations Defining and Governing the Use of CCM

---

[9] As previously noted, in limiting the use of CCM, Congress recognized that the use of that method permitted an extended period of deferral by long-term contractors. For larger long-term contractors like petitioner, Congress did not attempt to place a limit on the number of accounting periods that could be deferred. Instead, Congress generally prohibited the use of CCM. For long-term contracts entered into after Feb. 28, 1986, smaller contractors (those with average annual gross receipts of less that $10 million) may use CCM for contracts expected to be completed within 2 years. See sec. 460(e)(1). These limitations, however, have no direct bearing on our evaluation of whether petitioner's approach was correct and/or whether respondent has been arbitrary or capricious.

For the taxable years under consideration, section 446(b) generally outlined the methods of accounting for Federal tax purposes, but it did not specifically address whether taxpayers could use CCM.  Section 1.451-3, Income Tax Regs., however, specifically permitted the reporting of income and expenses from long-term contracts using CCM.  Petitioner selected CCM and is afforded some latitude in selecting a method of accounting. Section 1.446-1(a)(2), Income Tax Regs., provides:

> It is recognized that no uniform method of accounting can be prescribed for all taxpayers.  Each taxpayer shall adopt such forms and systems as are, in his judgment, best suited to his needs.  * * *

Respondent does not question petitioner's selection of CCM, but determined that Contract 2034 should be severed into four annualized reportable portions.  Rules governing severance and aggregation of long-term contracts were promulgated by the Secretary and set forth in section 1.451-3(e)(1), Income Tax Regs.[10]  That regulation generally provides:

------------------------------------

[10]  These regulations were modified pursuant to the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324.  Sec. 229 of that Act was titled "Modification of Regulations on the Completed Contract Method of Accounting", and directed the Treasury to amend the regulations governing CCM to clarify, among other things, the rules governing severance and aggregation of long-term contracts:

> SEC. 229(a).  In General.--The Secretary of the Treasury shall modify the income tax regulations relating to accounting for long-term contracts to--
>> (1)  clarify the time at which a contract is to be considered completed,
>> (2)  clarify when--
>>> (A)  one agreement will be treated as
(continued...)

For the purpose of clearly reflecting income (e.g. to prevent the unreasonable deferral of recognition of income or the premature recognition of loss), it may be necessary in some instances for the Commissioner either to treat one agreement as several contracts or to treat several agreements as one contract. [Sec. 1.451-3(e)(1)(i)(A), Income Tax Regs.]

The regulation continues by providing criteria for

severance or aggregation of contracts, as follows:

Whether an agreement should be so severed or several agreements so aggregated will depend on all the facts and circumstances. Such facts and circumstances may include whether there is separate delivery or separate acceptance of units representing a portion of the subject matter of the contract, whether such units are independently priced, whether there is no business purpose for one agreement rather than several agreements or several agreements rather than one

---

[10](...continued)
        more than one contract, and
            (B) two or more agreements will be
        treated as one contract, and
            (3) properly allocate all costs which
    directly benefit, or are incurred by reason of,
    the extended period long-term contract activities
    of the taxpayer. [96 Stat. 493.]

The TEFRA legislative history contains the following comment: Congress believed that the prior rules relating to the completed contract method of accounting needed to be changed because the income of some taxpayers using that method of accounting was not being clearly reflected. * * * completion of contracts had been deferred for tax purposes by treating certain agreements as a single contract for several units rather than several contracts for single units, even though each unit was delivered or accepted separately and had been separately and independently priced. Congress believed, therefore, that Treasury should amend its regulations to prevent this inappropriate deferral of income. [Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Tax Equity and Fiscal Responsibility Act of 1982 at 150 (J. Comm. Print 1982).]

agreement, and such other factors as customary commercial practice, the dealings between parties to the contract, the nature of the subject matter of the contract, the total number of units to be constructed, manufactured, or installed under the contract, and the contemplated time between the completion of each unit. [Sec. 1.451-3(e)(1)(ii), Income Tax Regs.]

"[S]eparate delivery or separate acceptance of portions * * * [of long-term contract items] does not necessarily require severing".  Sec. 1.451-3(e)(1)(iii), Income Tax Regs.

Section 1.451-3(e)(1)(iv), Income Tax Regs., explains the role of differing price arrangements:

One agreement may be severed, or several agreements may be aggregated, based upon the pricing formula of such agreements.  For example, in the case of a multi-unit agreement for several similar items, if the price to be paid for similar units is determined under different terms or formulas (for example, if some units are priced under a cost-plus incentive fee arrangement, and later units are to be priced under a fixed-price arrangement), then the difference in the pricing terms or formulas may indicate that the agreement should be treated as several contracts.

Section 1.451-3(e)(1)(v), Income Tax Regs., provides:

An agreement generally will be treated as several contracts where there is no business purpose for entering into one agreement rather than several agreements.  A factor which may evidence that no such business purpose exists is that the agreement covers two or more subject matters, none of which readily can be determined to be the primary subject matter of the contract * * * ; such factor must be considered along with other factors indicating the presence or absence of business purpose.

Finally, section 1.451-3(e)(1)(viii), Income Tax Regs.

provides:

If the number of items to be supplied is increased (as by the exercise of an option or the issuance of a

"change order"), the supplying of such additional items generally results in the agreement being changed into several agreements.  * * *

These regulations also include several examples that illustrate the regulatory language.  Examples (2), (3), and (6) of section 1.451-3(e)(2), Income Tax Regs., are of particular relevance to this case.

In <u>Sierracin Corp. v. Commissioner</u>, 90 T.C. at 369, we emphasized that the independent pricing factor should, among the various facts and circumstances, be given "special emphasis".  Example (2) illustrates the independent pricing factor for purposes of aggregating two separate contracts and involves a shipbuilder on CCM who entered into two agreements at about the same time to construct two submarines of the same class.  The two agreements were the product of a single negotiation.  It was anticipated that, because the shipbuilder had never constructed this class of submarine before, the costs incurred in constructing the first submarine would be substantially greater than the costs incurred in constructing the second submarine, which was to be delivered 1 year after the first submarine.  It was pointed out in Example (2) that

> If the agreements are treated as separate contracts, it is estimated that the first contract could result in little or no gain, while the second contract would result in substantial profits.  * * *

It is unlikely that the shipbuilder would have entered into the contract to construct the first submarine for the price specified

without entering into the contract to construct the second submarine. In those circumstances, Example (2) contains the conclusion that it may be necessary for the Commissioner to aggregate the two agreements for purposes of applying the long-term contract method.

Example (3) is a variation of Example (2), where 1 year after the original contracts are signed the customer issues a "change order" providing for a third submarine of the same class to be constructed. The portion of the total contract price attributable to the "change order" can reasonably be determined, and a reasonable business person would have entered into the agreements to construct the first two submarines for the price specified without regard to whether a third submarine was added.

Under Example (3) the "change order" for the third submarine is to be treated as a separate contract for purposes of applying the shipbuilder's CCM. Example (3) also focuses on the independent pricing factor for its conclusion.

Example (6) emphasizes the importance of independent pricing, as follows:

> T, a calendar year taxpayer engaged in the business of manufacturing aircraft and related equipment, enters into an agreement in 1982 with the B government to manufacture 10 military aircraft for delivery in 1984. It is anticipated at the time the agreement is entered into that B may enter into an agreement with T for the production and sale of as many as 300 of these aircraft over the next 20 years. In negotiating the price for the agreement, B and T take into account the expected total cost of manufacturing the 10 aircraft, the risks and the opportunities associated with the agreement and

all other factors that the parties consider relevant, in such a manner that T would have entered into the agreement with the terms agreed upon whether or not T would actually enter into one or more additional production agreements. However, it is unlikely that T would have entered into the agreement but for the expectation that T and B would enter into additional production agreements. In 1984, the 10 aircraft are completed by T and accepted by B. In 1984, T also enters into an agreement with B to manufacture 20 aircraft of the same type for delivery in 1986. In negotiating the price for these 20 aircraft, B and T take into account the fact that the expected unit costs for this production of 20 will be different than the unit costs of the 10 aircraft completed in 1984, but also that the expected unit costs of this production of 20 will be substantially higher than the costs of future production. Because the price awarded for each of the two agreements takes into account the expected total costs and the risks expected for each agreement standing alone, the terms agreed upon for any one of the agreements are independent of the terms agreed upon for the other agreements. Under the facts of this example, the two agreements may not be aggregated into one contract for purposes of applying T's long-term contract method.

C. Discussion

1. General

Respondent correctly points out that this is not a case where the Court must decide whether use of a particular accounting method does or does not clearly reflect income. Implicit in respondent's distinction is the basic principle that, generally, CCM is accepted for Federal tax purposes as clearly reflecting income when used by qualified taxpayers. It should be noted that CCM inherently permits delay in reporting income or loss beyond that permitted by annualized methods of accounting for Federal tax purposes. Respondent agrees that petitioner is

entitled to use CCM.  So, the question here concerns whether, in using CCM, petitioner correctly reported its income and deductions from Contract 2034 after the completion and delivery of the 480 contracted-for units or whether profit should be segregated and reported on four separate occasions after the completion and delivery of 120 units.

No question of law is presented, and we focus on whether the facts and circumstances presented in this case are sufficient to carry petitioner's burden of showing that respondent's exercise of regulatory discretion was arbitrary or capricious (i.e., without sound basis in law and/or fact).

### 2.  Can Petitioner's Profit Be Reasonably Estimated for Each Program Year?

The regulations do not specifically require, as a condition to severing a contract, that the taxpayer's profit for the severed period be determinable with reasonable accuracy.  The parties argue this point, however, as a threshold matter to the question that must precede any consideration of severance.  It should be noted, however, that the ability to reasonably compute the amount of profit or loss attributable to each annualized 120-aircraft allocation, does not mean that the profit or loss predicted for each severed year would ultimately result.  In that regard, petitioner contends that its profits for a severed period were not reasonably determinable; e.g., due to the interdependent pricing under the multiyear contract, petitioner could experience

a per-aircraft profit as of 1984 for the 120 aircraft from the 1982 program year completed in 1984, but after delivery of the 480th aircraft, petitioner could ultimately experience a per-aircraft loss for all aircraft, including the batch completed in 1984.

The parties disagree about whether a reasonably accurate annual determination of petitioner's Contract 2034 profit or loss could be accomplished. Respondent contends that petitioner was able to determine each program year's income and expenses with reasonable certainty. Respondent argues that petitioner was able to do this for financial accounting purposes and to satisfy the Government's reporting requirements and that the Government made payments to petitioner without hold-backs or reservations to secure future performance.

Petitioner contends that respondent's premise is factually incorrect, and even if its profits could be determined by program year with reasonable certainty, that factor would not bar its use of CCM and/or serve as a reason necessitating severance of Contract 2034. We agree with petitioner that the ability to calculate profit for a period with reasonable certainty does not per se mandate that the period be severed.[11] On the other hand,

---

[11] If, for example, petitioner is able to calculate the profit or income attributable to each aircraft, would it then be appropriate to sever Contract 2034 into 480 reportable units? Obviously, that is only a threshold factor and not determinative of whether severance should be applied.

it would be difficult to sever a contract if profit for the severed period was not determinable with reasonable certainty.

The annualized amounts of income respondent determined in the notice of deficiency are based on or in reference to the projected profit for each program year reflected in the Contract Cost and Profit Summaries (CCPS's) prepared by petitioner on December 31, 1984, 1985, and 1986, respectively. CCPS's were not used to determine petitioner's profit with respect to Contract 2034, either for tax or for financial accounting purposes.[12] CCPS's were derived from, and contained essentially the same information as, the Cost Performance Reports (CPR's) required to be provided to the Air Force. The Air Force used the CPR's as program management tools, not as accounting reports. There was testimony to the effect that the CPR's could not be used as cost pricing data for negotiating subsequent contracts because the CPR's were not sufficiently accurate to be certified under the Truth in Negotiations Act, Pub. L. 87-653, 76 Stat. 528 (1962). Significantly, all progress payments made under Contract 2034

---

[12] Petitioner used the percentage completion method for financial accounting purposes. Under that method, the gross income recognizable from long-term contracts is that proportion which corresponds to the percentage of the total contract completed during the taxable period. Accordingly, petitioner's financial income reported on the percentage completion method would not comport with an annualized version of CCM, as determined by respondent. As previously noted, the percentage completion method is mandatory for petitioner's reporting of its long-term contracts entered into after the 1986 tax year. During the years under consideration, however, respondent concedes that petitioner is entitled to use CCM.

related to costs incurred on the entire contract, and were not broken out by program year.

Petitioner was able to annualize its costs and receipts for reporting to the Air Force. This reporting may have been used as the basis for annual Government appropriations, progress payments, and other administrative purposes underlying Contract 2034. Petitioner, however, did not calculate or report its profit by segregating 120 aircraft into any form of annualized configuration. It is important to understand that irrespective of its annualized reporting of costs and receipts to the Air Force for administrative contract purposes, petitioner's profit or loss from Contract 2034 was interdependent and depended on the receipts and costs for all 480 deliverable units.

The annualized income for 120 aircraft is more easily and reasonably computed retrospectively; i.e., after delivery of all 480 aircraft under Contract 2034. The estimation of the profit or loss for 120 aircraft becomes less accurate and hence less reasonable the more that it precedes the delivery of the 480th aircraft. This is so because the production of the F-16 aircraft under Contract 2034 was a progression of continually more sophisticated and complex machines. In that same vein, the aircraft are interdependently priced, and the final "definitized" price and any profit or loss thereon were dependent on risks that may not have existed or been discovered until delivery of the 480th aircraft. Accordingly, it would have been difficult to

make in 1984, after delivery of 120 aircraft, an accurate determination of the 1982 program year profit, inasmuch as there then remained to be delivered the vast majority of aircraft called for under Contract 2034.

### 3. Independent Pricing Factor

In evaluating Contract 2034, respondent suggests that four relevant facts and circumstances, as set forth in section 1.451-3(e)(1)(ii), Income Tax Regs., are to be considered. Those factors concern whether: (1) There was separate delivery and/or acceptance of aircraft; (2) the aircraft were independently priced; (3) there was a business purpose for several or a single contract; and (4) there were various other customary commercial practices involving the production of aircraft. Respondent, by grouping the factors together, attempts to place independent pricing on par with other factors.[13] However, as decided in Sierracin Corp. v. Commissioner, 90 T.C. 341 (1988), the independent pricing aspect is particularly significant.

---

[13] Respondent in an Action on Decision acquiescing in Sierracin Corp. v. Commissioner, 90 T.C. 341 (1988), made the following comment about our emphasis on independent pricing in that case:

> The court's undue emphasis on independent pricing restricts the application of the regulations in other cases and is not controlling. For example, in a situation in which there are significant time intervals between the delivery dates of items under a multi-unit contract, the Service is not precluded from asserting that the contract should be severed notwithstanding the absence of independent pricing. [Action on Decision 1990-016 (May 18, 1990), 1990-1 C.B. 1.]

The parties approach the independent pricing factor from differing perspectives. Respondent emphasizes that Contract 2034 is funded on an annual basis and is more like an annual option contract. Respondent also points out that the number of aircraft under Contract 2034 was, at some point, increased beyond the original 480. Respondent contends that these attributes make Contract 2034 more like the option-type agreement referenced in section 1.451-3(e)(1)(viii), Income Tax Regs., which, in relevant part, provides:

> If the number of items to be supplied is increased (as by the exercise of an option or the issuance of a "change order"), the supplying of such additional items generally results in the agreement being changed into several agreements. See § 1.451-3(e)(1)(i).

The cross-reference indicates that subdivision (viii) is to be interpreted consistent with the facts and circumstances test of section 1.451-3(e)(1)(ii), Income Tax Regs.

Petitioner contends that Contract 2034 was a fixed-price incentive contract with a single pricing formula for the 480 aircraft in question. Petitioner points out that the final price could not have been determined until after the 480th aircraft was delivered. Petitioner faced significant and continuing risks during the performance of Contract 2034 that could have increased its costs and affected the projected profit of already delivered aircraft. As the delivery of the last or 480th aircraft approached, however, the potential risk and the likelihood of such an occurrence were reduced. As production and delivery of

the aircraft approached the 480th unit, the possibility and potential for significant impact from design and production problems must lessen. We have no difficulty, however, finding that the 480 aircraft to be manufactured under Contract 2034 were interdependently priced.

Contract 2034 imposed a binding obligation on the Air Force to fund successive program years, except in the event that Congress failed to appropriate funds or the Air Force terminated the contract for convenience or default. The successive funding of each fiscal year did not constitute a new order or exercise of an option. In Beta Sys., Inc. v. United States, 838 F.2d 1179, 1183 n.2 (Fed. Cir. 1988), the court explained the operation of a multiyear contract and the effect of funding as follows:

> When the government enters into a multi-year procurement, as here, the negotiated terms apply to the full procurement whether or not funding has been approved for all years of the contract. This contract, like all governmental undertakings, contains the panoply of clauses by which the government can terminate the contract, or authorize the stepwise progression of its performance over its multi-year term. These assorted termination rights do not relieve either the government or the contractor of its obligations as set forth in a multi-year contract that is not terminated. Otherwise, rational multi-year and long-lead procurement would be impossible. [Citation omitted.]

A multiyear contract obligates the Government to complete the funding for the entire contract absent a valid basis for canceling the contract:

> The fact that the requirements for the years after the first year in a multi-year procurement are unfunded

does not make a multi-year contract an option contract.
* * *

The contract binds the Government to purchase the entire multi-year procurement quantity and to fund the successive Program Years.[14]  * * *  [Beta Systems v. United States, 16 Cl. Ct. 219, 228 (1989).]

 The Claims Court also noted:

Multi-year procurement contracts are, in essence, single, indivisible entities.  As a result, an equitable adjustment following termination of a multi-year contract must be based upon the entire contract. [Id. n.11; citation omitted.]

Respondent argues that the Air Force reserved a unilateral annual right to procure the next program year's projected requirements.  Respondent's position overstates the Government's rights with respect to multiyear Contract 2034.  The Air Force did not have the unlimited right to cancel any future year. Contract 2034 was a multiyear contract which could have ended if Congress failed to fund the F-16 program or if a Government determination was made that there was no need to acquire any remaining F-16's under the contract.

Respondent also focuses and relies upon language in CLIN 0001 of Contract 2034, which states:  "ITEMS 0002 THROUGH 0015 ARE NEITHER PRICED NOR FUNDED NOR IS THE GOVERNMENT UNDER ANY OBLIGATION TO SUBSEQUENTLY ACQUIRE SAID ITEMS."  Petitioner counters that the CLIN 0001 language denotes that 2034, like all

---

[14]  Petitioner also argues that the Government may not cancel any part of a multiyear contract on the ground that the terms of the contract are disadvantageous, citing Appeal of Varo, Inc., 70-1 B.C.A. (CCH) par. 8,099 (1969).

multiyear contracts, was not fully funded at its inception, and that the Government retained the right to cancel unfunded portions of Contract 2034 in certain circumstances.  We find petitioner's interpretation to be correct and consistent with the analysis of the above-quoted cases holding that the Government's ability to cancel a multiyear contract is not discretionary, but is limited to situations in which Congress fails to appropriate funds for the goods ordered under the contract, or the Government no longer has a need for the goods ordered under the contract.

Contract 2034 obligated the Air Force to fund each program year under the contract as long as Congress continued to appropriate funds and the Air Force continued to need the F-16's ordered under Contract 2034.  If, for example, costs of petitioner's performance dramatically declined during the term of Contract 2034, the Air Force was not entitled to cancel Contract 2034 or require petitioner to produce the remaining F-16's at a lower price.

The Air Force's ability to cancel prior to full funding of all 4 fiscal years was sufficiently limited as a matter of Government contracting law so as to deplete the substance of respondent's claim that the funding of each successive fiscal year was merely an increase in order quantity.  The Air Force did not have unqualified or unlimited legal power to cancel, and the 480 aircraft procured were interdependently priced.

One significant foundation of respondent's argument on brief is the premise that "the total number of F-16 aircraft and support equipment to be manufactured and delivered by petitioner under the contract was increased in annual increments by unilateral contract modifications".  This argument assumes that the contract modifications under which annual funding was added were "change orders" within the meaning of section 1.451-3(e)(1)(viii), Income Tax Regs.  Respondent's position is weakened by the fact that any change to a Government contract, without regard to its magnitude, required a contract modification.  The act of modification, by itself, has no particular meaning and does not automatically place a long-term contract within the influence of section 1.451-3(e)(1)(viii), Income Tax Regs.  That section is more dependent upon whether each such addition increased the obligation for the number of aircraft ordered under the long-term contract.

Respondent also argues that the Air Force's rights under terms of a multiyear contract most closely resemble those of a priced option to acquire additional units.  The evidence does not support respondent's contention that Contract 2034 was, in effect, a series of option contracts.  The parties to Contract 2034 did not intend to enter into an option contract.  The cost benefits sought and obtained by the Air Force and petitioner under Contract 2034, in part, resulted from interdependent

pricing of all the aircraft to be manufactured and delivered over the contract's multiyear term.

It should be noted that respondent did not argue that the Air Force's right to terminate fully or partially 2034 for its convenience rendered the contract severable. In that regard, all Government contracts, irrespective of their timespan (including multiyear contracts), are subject to termination for the Government's convenience or for a party's default. Under termination conditions, petitioner would be compensated based on prescribed terms set out in the contract and established legal requirements.[15]

In this regard, all 4 program years under Contract 2034 were partially funded from inception as to long-lead funding and EOQ items. Respondent's position does not adequately explain or account for the long-term funding aspects of Contract 2034. Additionally, as of November 1, 1984, Congress had fully funded Contract 2034, and cancellation for lack of funding was no longer a factor. The question of severance of Contract 2034 into four contracts by program year would not have become possible for tax reporting purposes until petitioner filed its 1984 tax return. Due to the long-term nature of aircraft production, the 1982

---

[15] Petitioner also points out that because the 1982 and 1983 program years were funded simultaneously in P00 80, respondent's increase-in-order theory should logically result in severance into three contracts, not four as respondent had determined.

contract year would not be complete until the Federal income tax reporting for the 1984 tax year. In part, respondent's theory relies on any right(s) the Government may have had to cancel. In that regard, the Government no longer possessed an ability to cancel for lack of funding when petitioner filed its return for 1984, the first year in which the decision to sever would have had any consequence to petitioner's tax returns.

### 4. Separate Delivery and Acceptance

Respondent also argues that the aircraft were delivered by program year and that each aircraft was separately delivered and accepted. The regulations provide that separate delivery or separate acceptance of portions of the subject matter of a contract is a factor to be considered in deciding whether to sever. Sec. 1.451-3(e)(1)(iii), Income Tax Regs. Separate delivery or acceptance does not, by and of itself, require severance. Example (4), section 1.451-3(e)(2), Income Tax Regs., does not require severing by separate delivery and acceptance where there was a business reason for entering one contract rather than several contracts. In Sierracin Corp. v. Commissioner, 90 T.C. 341 (1988), we rejected severance of long-term contracts even though there was separate delivery under the contracts in question. From the perspective of Sierracin, separate delivery was mitigated by the existence of interdependent pricing.

Petitioner also notes that the majority of the aircraft produced under Contract 2034 was delivered after all 4 program years were fully funded, and Contract 2034 was at all times administered as one contract for 480 aircraft.  Petitioner also points out that if separate delivery per se justified severing, then Contract 2034 should be severed into 480 contracts for 480 separately delivered aircraft.

Respondent contends that the Air Force and petitioner were required to establish target costs for each program year. Petitioner counters that the target costs were due to Congress' annual appropriations and inability legally to obligate funds for future years.  The use of target costs and profits broken down by program years, however, had no bearing on petitioner's ultimate profit upon completion of the contract, which was determined solely by reference to the single target cost, target profit, and share line or ratio adopted for Contract 2034.

Respondent also argues that the liquidation of progress payments as each aircraft was accepted supports the attempt to sever Contract 2034 by program year.  Respondent argues that the liquidation of progress payments under Contract 2034 is evidence that each of the 4 program years was independently priced. Liquidation of progress payments, however, would not enable petitioner to determine its profits on a program year basis with respect to each aircraft.  Moreover, by calculating the amounts liquidated for each aircraft identified to a program year,

petitioner would not have been able to determine its profits by aircraft or for a particular program year.

The parties argue about the relevance of Example (2) under section 1.451-3(e)(2), Income Tax Regs. Respondent focuses on the fact that the submarine contractor was willing to enter into a contract to build one submarine for a minimal profit because a second submarine would produce substantial profit. Respondent contends that Example (2) contains a situation where the price is truly dependent, whereas the price in Contract 2034, at least initially, was not. Respondent's contention is factually flawed because the ultimate price for the 480 aircraft was interdependent, and petitioner did not agree to a fixed price for the first year only and/or subsequently negotiate a price for later program years under Contract 2034.

Petitioner also counters that respondent's argument is dependent on "average pricing" and that there is no mention in Example (2) of "average pricing". Petitioner instead construes the key facts in Example (2) as being: "These agreements are the product of a single negotiation" and that "A reasonable business person would not have entered into the agreement to construct the first submarine for the price specified without entering into the agreement to construct the second submarine." Following through, petitioner contends that all 480 aircraft were priced in one single negotiation, which resulted in one pricing formula for all 480 aircraft. No reasonable person would have agreed to build

the first 120 aircraft at the price implicit in Contract 2034 without a binding agreement to build the remaining 360.

The record here supports petitioner's reasoning on this point. Petitioner made several proposals for price, depending on whether there would be multiyear or annual contracts. In addition, the Air Force and petitioner stood to enjoy meaningful cost savings under a multiyear contract as opposed to four annual contracts.

The parties next debate the significance of Example (6), of section 1.451-3(e)(2), Income Tax Regs., which presents an aggregation situation. Respondent argues that the price terms within Contract 2034 are almost on all fours with the facts set forth in Example (6). Petitioner counters that the most significant factor in Example (6) precluding aggregation of the two aircraft contracts is that

> In negotiating the price for the agreement, B and T take into account the expected total cost of manufacturing the 10 aircraft, the risks and the opportunities associated with the agreement, and all other factors that the parties consider relevant, in such a manner that T would have entered into the agreement with the terms agreed upon whether or not T would actually enter into one or more additional production agreements. * * * [Sec. 1.451-3(e)(2), Example (6), Income Tax Regs.; emphasis added.]

We agree with petitioner's analysis that neither the taxpayer in the example nor petitioner would have accepted the price terms agreed to in the multiyear contract as the basis for an annual

commitment.  Without the long-lead purchase and EOQ savings, petitioner would have been at a substantial cost disadvantage.

Example (6) instructs that two orders of goods are not interdependently priced if prices are determined independently for the two contracts in separate negotiations.  It follows that the existence of a single-price negotiation for all items ordered under a contract is a strong indicator that all items under the contract are interdependently priced, as was the case with Contract 2034.

Respondent, in effect, argues that in a fixed-price incentive contract where actual costs of any program year's requirements exceeded the point of total cost absorption for that program year, profits realized in performance of other program years could be reduced.  Respondent, on brief, asks us to find that

> The "point of total cost absorption" is when, under share ratio set by the incentive price revision clause, it is the point at which the costs have reach[ed] the ceiling cost, and the profit of the contractor is being impacted and the contractor starts to incur a loss on the contract.

Petitioner counters that

> The "point of total cost assumption" is the point at which the contractor bears 100% of the cost overruns; this point occurs before the contractor reaches the ceiling price.  * * *  In other words, at the point of total assumption, for every dollar of overrun, the contractor's profit is reduced by a dollar; the contractor, however does not start to incur a loss on the contract until the contractor's costs exceed the ceiling price.  * * *  In addition, whenever the contractor is overrunning the contract (i.e., the

contractor's costs exceed the target cost), its profits are being impacted, even prior to reaching the point of total cost assumption. Prior to reaching the point of total cost assumption, however, the contractor bears its share of the cost overrun as provided for by the share line. In [Contract 2034], petitioner would have borne 40 cents of every dollar of cost overruns up to the point of total cost assumption at which point it would have borne 100% of the cost overruns. [Citations omitted.]

We agree with petitioner that the point of total cost assumption in a fixed-price incentive contract is determined by the relationship between the target cost, the target profit, and the share line. Contract 2034 had only one share line and, accordingly, only one point of total cost assumption. Thus, respondent's argument is not borne out by the facts.

Respondent has also asked us to find that

Under the provisions of Contract 2034, as definitized by * * * [P00 80], when a final determination is made, if no single program year exceeds its ceiling, then the profits on the other three program years, would not be affected.

We agree with petitioner that respondent's requested finding is misleading because there is only one ceiling price and one incentive price revision for the entire contract; there are no separate program year ceilings or price determinations.

In a similar vein, respondent also argues that the dependency of price terms among the program years under the incentive provisions might be entitled to some weight in the determination to treat Contract 2034 as several agreements if there was a significant probability that the cost overruns

incurred in performance of a program year's requirements might reach the point of total cost absorption. This argument must also fail because Contract 2034 did not have separate points of total cost assumption for individual program years. On the contrary, petitioner faced very significant risks in performing Contract 2034 because of the sophistication and integration aspects of the models of the F-16 to be produced. An example of such a risk was the incident involving the cracks that developed in the 446 bulkhead.[16] In addition, petitioner relied upon numerous subcontractors, many of whom manufactured complex parts. It should also be noted that Contract 2034 was the first multiyear procurement of a major weapons system, and petitioner bore substantially more risk than it would have borne under four annual contracts. Petitioner necessarily assumed the risks of its subcontractors because petitioner would have incurred significant costs had a subcontractor failed to perform satisfactorily.

5. Business Purpose

Respondent stipulated that both petitioner and the Air Force had valid business purposes for entering into a multiyear contract, as opposed to four separate contracts. There is no

---

[16] Petitioner also cited the example involving Sierracin Corp., which manufactured many of the transparencies used in the F-16's produced under Contract 2034. Petitioner went on to note that this Court found that Sierracin's Sylmar division was subject to substantial risk in producing such transparencies. Sierracin Corp. v. Commissioner, 90 T.C. 341, 348-349 (1988).

question that relatively substantial savings were experienced through the multiyear feature of Contract 2034. The cost savings constituted the Air Force's principal motive for seeking a multiyear contract.

Petitioner believed it could achieve substantially higher profit rates under a multiyear contract than it could otherwise achieve under four annual contracts. Petitioner also believed it could achieve substantially higher sales volume of the aircraft under the multiyear approach of Contract 2034. Petitioner's agreement to a multiyear contract instead of continuing annual contract procurement was also dependent upon expectations that it would obtain increases in the sales volume of aircraft to customers other than the U.S. Government. Finally, petitioner viewed the multiyear form of procurement as providing stability to its F-16 production and operations over the term of a 4-year contract.

6. The Customary Business Practices of the Air Force and Petitioner

Respondent argues that, in negotiating Contract 2034, the Air Force and GENDYN (hereinafter the parties) made a concerted effort to adjust the rates of periodic progress payments and liquidations so as to provide petitioner with the same economic results as it would have realized had Contract 2034 been four separate procurement contracts.

Petitioner argues that the Air Force and Congress established that substantial cost savings would be accomplished using the multiyear form of procurement in place of the previous annual contracts. Petitioner hoped to benefit from this by earning a higher profit rate than it had earned under annual contracts.

Petitioner concedes that the Air Force and petitioner tracked costs by program year and that each aircraft ordered was identified in connection with a program year. Petitioner also agrees with respondent that billing prices could be adjusted to reflect petitioner's performance under Contract 2034. Petitioner, however, argues that it is equally clear that Contract 2034 was one contract, with one pricing formula, and, regardless of amounts advanced to petitioner during the course of the contract, all 480 aircraft ordered by Contract 2034 were interdependently priced, and petitioner's profit was not determinable until Contract 2034 was completed.

The customary business practices of the parties had not been to enter into multiyear contracts. Instead, annual price negotiation and funding were the customary practice. The parties retained some of the prior practices such as reliance on the annual Government budget process. The parties also departed significantly from the prior practices by their entry into a 4-year commitment. Each side stood to benefit by the extended period, and each exposed itself to certain risks by undertaking

the long-term approach.  Although the parties remained subject to certain features of the annual appropriation process, their long-term commitments, in many respects, changed the way they did business.

Both petitioner and respondent make valid points concerning the business exigencies and customs, but ultimately the Air Force and petitioner were subject to a long-term contract with interdependent pricing of all the aircraft deliverable under Contract 2034.

### 7.  Conclusion and Summary--Contract 2034

In the final analysis, respondent asks that we focus on attributes of Contract 2034 that represent only a few of the criteria contained in the regulations for deciding whether a long-term contract should be severed or aggregated.  Petitioner, however, meets the most significant as well as the majority of the regulatory criteria for its reporting the income and expenses for all 4 years of Contract 2034 as a single long-term contract under CCM.

The main thrust of respondent's argument is that petitioner's use of CCM to report the income and expenses of Contract 2034 does not clearly reflect income unless the contract is severed into 4 contracts each for the manufacture and delivery of 120 aircraft.  As petitioner has shown, however, Contract 2034 was a 4-year commitment for which pricing and resultant profit were dependent on the fabrication and delivery of all 480 units.

It is true that each aircraft was individually delivered by petitioner and accepted by the Air Force, and that completion of the contract was dependent upon annual congressional appropriations. In sum and substance, however, this was a single multiyear contract for the delivery of 480 aircraft. Financially and legally, Contract 2034 was no different from a long-term contract to build a structure composed of 480 parts. In either event, the contract would not be completed until the 480th part was completed and put in place or placed in service with the other 479 parts to complete the delivery and/or form the final structure. In both situations, the first, last, and parts in between, bear on the profitability of the contract. Contract 2034 was a financial and technological continuum for a 4-contract-year period. Instead of a series of 1-year contracts which take 2-1/2 years each to complete, it was a 4-year contract that took almost 7 years to complete. Contract 2034 was a long-term contract of the type for which CCM is a permissible method.

We recognize respondent's argument that petitioner's reporting of any profit on the first group of aircraft would be accelerated if Contract 2034 were severed into four separate contracts. However, we do not find that petitioner in any manner distorted or abused CCM. As a matter of principle, we must accept that CCM permits deferral beyond that which would be permitted under the accrual method. We are unable to find that

the delay alone in these circumstances prevented petitioner's income from being clearly reported and reflected.

It may be that use of CCM, per se, does not clearly reflect income, but it is a method that petitioner was entitled to use for the period under consideration. Congress, for years after 1986, has practically banned the use of CCM for large contractors and limited its use to 2-year contracts for certain smaller contractors who meet specific requirements. In that regard, the legislative history, coupled with the structure of the post-1986 statute, make it obvious that CCM was not believed to clearly reflect income in general. That proscription, however, does not apply to the years before us.

In addition, we are not confronted with the type of "gross distortion" discussed in Ford Motor Co. v. Commissioner, 102 T.C. at 100-101. In that case, the taxpayer deducted the total cost of structured settlements in the year the settlement was reached and made annual payments over an extended period of years, far in excess of the period of deferral in this case. Also, as earlier noted, the difference between petitioner's reporting and respondent's determination in terms of the amount of delay becomes nominal and then disappears as the deliveries approached the fourth program year of Contract 2034. There was no difference between respondent's and petitioner's approaches as they applied to the 1985 year, other than the question of severance, because in either case income and deductions would be

reported for 1987. Finally, Contract 2034 was fully funded before the first severed annualized reporting period matured for tax reporting purposes.

Accordingly, under the regulation by which the question of severance and/or aggregation of long-term contracts is to be judged, we find that respondent's determination that Contract 2034 must be severed was without sound basis in law and/or fact and, thus, was arbitrary or capricious.

II. Should Contract 2038 Be Treated as a Long-term Contract and Reported Under the Completed Contract Method?

Respondent determined that Contract 2038 is not a long-term contract within the meaning of section 1.451-3(a), Income Tax Regs. Petitioner does not contend that Contract 2038 qualified on its own as a long-term contract. Nor does petitioner contend that the services performed under Contract 2038 (the MSIP contract) were of benefit solely to Contract 2034. Instead, petitioner argues that the services performed under the MSIP contract were incidental to and necessary for performance of Contract 2034 and should be accounted for as part of Contract 2034 under petitioner's completed contract method of accounting. Even though Contract 2038 is substantial and completely separate from Contract 2034, petitioner seeks to treat Contract 2038 as though it consisted of incidental indirect costs attributable to a long-term contract as described in various regulations cited below.

A "long-term contract" is defined in section 1.451-3(b)(1)(i), Income Tax Regs., as a building, installation, construction, or manufacturing contract which is not completed within the taxable year in which it is entered into. Contract 2038 does not meet that definition. Contract 2038 provided for services under MSIP, an engineering and development program, viz, it was in essence a contract for the performance of services.

Petitioner's argument, in essence, is that Contract 2038 is incidental to and necessary for performance of Contract 2034. Petitioner relies on a labyrinth of related regulation sections involving CCM, section 1.451-3(a)(1), 1.451-3(d)(5)(i) or (6)(i), 1.451-3(d)(5)(iii), 1.451-3(a)(3), and 1.451-3(d)(5), Income Tax Regs., in support of its position. Petitioner contends that certain indirect costs and expenses attributable to long-term contracts, including direct labor costs and direct material costs that are incidental to and necessary for the performance of a long-term contract, should be allocated to that contract.

Based on the above regulations, petitioner argues that respondent has sanctioned petitioner's position by interpreting section 1.451-3(d)(5), Income Tax Regs., in a manner that would permit research expenses that are incidental to and necessary for the performance of a long-term production contract to be allocated to and accounted for with a long-term contract. Petitioner directs our attention to the following language from

G.C.M. 39803 (Nov. 16, 1989) (citing section 1.451-3(d)(9)(x)(E), Income Tax Regs.):

> Income and expenses attributable to * * * services that directly benefit or are performed by reason of a taxpayer's long-term contract should be accounted for as part of the long-term contract that is benefited and, thus, should be accounted for under taxpayer's method of accounting for the subject matter of the long-term contract.

> \*       \*       \*       \*       \*       \*       \*

> engineering and design costs that are incidental to and necessary for the performance of non-extended period long-term contracts are allocable contract costs.

Respondent counters that section 1.451-3(d)(9), Income Tax Regs., concerns "extended period long-term contracts" and that neither Contract 2034 nor Contract 2038 fits within that category. Respondent also notes that the contracts would have qualified as extended period long-term contracts under another regulation section, but the referenced section is applicable for long-term contracts entered into after December 31, 1982, so that Contracts 2034 and 2038 do not qualify. See sec. 1.451-3(g)(1), 1.451-3(d)(6), Income Tax Regs. Next, respondent points out that section 1.451-3(d)(9), Income Tax Regs., is limited in application to those contracts to which section 1.451-3(d)(6), Income Tax Regs., applies. Finally, respondent admits that after all of the above analysis there is an exception provided for in section 1.451-3(d)(9)(x)(E), Income Tax Regs., which section is applicable to all long-term contracts. Respondent, however, contends that section 1.451-3(d)(9)(x)(E), Income Tax Regs.,

contains the further caveat that costs properly accounted for are not otherwise to be allocated in accord with the section formula.

The regulations and other authority cited by petitioner in support of treating Contract 2038 as part of Contract 2034 for CCM reporting are directed at specific income, expenses and/or costs which are incidental or inconsequential to a long-term contract. Although the services performed under Contract 2038 were necessary for the performance of Contract 2034, respondent did not err by disallowing petitioner's approach of treating Contract 2038 as part of a long-term contract for income tax reporting purposes. Petitioner must fail here because Contract 2038 is a separate and substantial agreement for which a separate accounting is required. Contract 2038, as a separate contract, is only partially related to Contract 2034. Petitioner reports its income for Federal tax purposes under differing methods of accounting, depending on the type of contract it is performing. In that regard, Contract 2038 is not a long-term contract and does not separately qualify for the completed contract method of tax accounting. As noted above, the income and expenses attributable to services under Contract 2038 are the substance of a separate and substantial contract for services, separate and apart from Contract 2034, and should not be treated as incidental or inconsequential to Contract 2034. Contract 2038 is a separately reportable contract and does not merely constitute indirect costs and expenses attributable to a long-term contract.

The regulations and G.C.M. relied on by petitioner are not intended to reach the result petitioner seeks.

To reflect the foregoing,

<u>An appropriate order will be issued.</u>